## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 271 | **DATE** | 8/19/2003 |
| **CASE TITLE** | Alexian Brothers Health Providers vs. Humana Health Plan, Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. As already stated at length, Alexian's motion to dismiss Humana's Counterclaim is granted in part and denied in part. Only its counts II and VI have failed to survive. Alexian is ordered to file its reply to all surviving counts on or before September 2 and this action is set for a next status hearing at 9 a.m. September 10, 2003.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

AUG 2 0 2003 date docketed

IS docketing deputy initials

date mailed notice

**Document Number**

46

SN

courtroom deputy's initials

FILED FOR DOCKETING

03 AUG 19 PM 3: 52

CLERK
U.S. DISTRICT COURT

Date/time received in central Clerk's Office

mailing deputy initials

ALEXIAN BROTHERS HEALTH PROVIDERS )
ASSOCIATION, INC., et al., )
                                  )
    Plaintiffs-Counterdefendants. )
                                  )
    v.                            )    No.  02 C 271
                                  )
HUMANA HEALTH PLAN, INC., et al., )
                                  )
    Defendants-Counterplaintiffs. )

**DOCKETED**

**AUG 2 0 2003**

## MEMORANDUM OPINION AND ORDER

Alexian Brothers Health Providers Association, Inc.

("Alexian Association"), St. Alexius Medical Center ("St.

Alexius") and Alexian Brothers Medical Center ("Alexian Medical

Center") (collectively "Alexian," treated as a singular noun)

initially sued Humana Health Plan, Inc., Humana HealthChicago,

Inc., Humana Insurance Company and Humana HealthChicago Insurance

Company (collectively "Humana," also treated as a singular noun)

for breach of contract.  Humana in turn filed a Counterclaim,

which it then voluntarily superseded twice--first by an Amended

Counterclaim, then by a ten-count Second Amended Counterclaim

("SACc").  Each SACc count also claims breach of contract.

Alexian has moved to dismiss the SACc under Fed. R. Civ. P.

("Rule") 12(b)(6) for failure to state a claim.  That motion has

been fully briefed, and the parties' submissions reveal this to

be an obvious exception to this Court's most frequent practice of

dispatching such motions (win or lose) via oral rulings--hence

this lengthy memorandum opinion and order.  For the reasons

stated here, Alexian's motion is granted in part and denied in part.[1]

## Rule 12(b)(6) Standards

On Alexian's Rule 12(b)(6) motion, this Court accepts all well-pleaded factual allegations of the SACc as true, drawing all reasonable inferences in Humana's favor (<u>Sherwin Manor Nursing Ctr., Inc. v. McAuliffe</u>, 37 F.3d 1216, 129 (7th Cir. 1994)). No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" (<u>Hishon v. King & Spaulding</u>, 467 U.S. 69, 73 (1984), quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)).

## Facts[2]

Effective January 1, 1994 Humana and Alexian Association, an independent physician association ("IPA"), entered into an agreement ("IPA Agreement") under which Alexian Association arranged for the provision of medical and health care services for Humana's members (Count I ¶4). In part the IPA Agreement created an Institutional Services Fund ("Institutional Fund") funded by Humana. Claims made by Humana members for services

---

1    All references to exhibits, memoranda and the like will simply employ "A." for Alexian and "H." for Humana.

2    Because for Rule 12(b)(6) purposes this opinion must credit Humana's allegations, what follows in this <u>Facts</u> section is drawn from the SACc (cited "Count -- ¶ --"). Hence the factual recital omits "Humana alleges" or "assertedly" or any comparable locution, although this Court has not of course made any findings (as the <u>Facts</u> caption might otherwise suggest).

provided by Alexian Association were paid out of the Institutional Fund (Count I ¶5). In October 1999 the IPA Agreement was amended to alter the parties' obligations as to the Institutional Fund by specifying their equal sharing in any Institutional Fund shortfall (Count I ¶6).

Sometime in May 2000 the parties engaged in negotiations to restructure the IPA Agreement and to continue the parties' business relationship (Count I ¶8). Humana and Alexian Association did amend the IPA Agreement in October 2000, retroactively to June 1, 2000, in part by obligating Alexian Association to participate in the Humana Commercial HMO through December 31, 2001 and in the Humana Medicare HMO through July 31, 2000 (Count 1 ¶11; H. Ex. 1). In addition, Humana (1) agreed to adjust the capitation rates paid to Alexian Association and (2) forgave the Institutional Fund deficits incurred between October 1, 1998 and May 31, 2000 (H. Ex. 1). Those Institutional Fund deficits had totaled $4,900,616, and under the terms of the pre-amended IPA Agreement Alexian Association had owed half that amount--$2,450,308--to Humana (Count I ¶7). Finally, the amendment's terms were made effective for 19 months: until December 31, 2001 (Count I ¶9).

Alexian Association terminated its participation in the Commercial HMO on June 1, 2001 (Count I ¶12). SACc Counts I-III stem from that termination:

3

1.   In Count I Humana seeks to recover the Institutional Fund deficit balance owed to it (Count I ¶16).

2.   In Count II Humana asks to recover payments in excess of $725,000 that it made to other providers from June 1, 2001 to December 31, 2001--the period between Alexian Association's termination and the end of the IPA Agreement itself (Count II ¶10).

3.   In Count III Humana wishes to recover the adjusted capitation rates totaling $193,295 that it paid to Alexian Association from June 1, 2000 until the June 1, 2001 termination date of Alexian Association's participation in the Commercial HMO (Count III ¶11).

SACc Count IV involves an amendment to the IPA Agreement that took effect August 1, 1997. In that respect Humana seeks to recover $276,950 in payments that it made on Alexian Association's behalf for claims attributable to the Primary Care/Medical Services Fund ("Medical Fund") (Count IV ¶¶8-11). Alexian Association breached the amended IPA Agreement by failing to pay those claims and refusing to return the amounts paid by Humana.

Humana next targets St. Alexius in the breach of contract claims in SACc Counts V-VII. Those claims stem from the arrangement under which St. Alexius provided and arranged for medical and health services for Humana members in Hoffman Estates

4

and surrounding Cook County communities pursuant to the Hospital Services Agreement ("Services Agreement") effective March 1, 1993 (Count V ¶4).[3]

Between November 1999 and November 2001 St. Alexius accepted and retained payments that were in excess of contractual rates set forth in the Services Agreement (Count V ¶6). In Count V Humana seeks reimbursement for those overpayments totaling approximately $756,000 (Count V ¶7).

In Count VI Humana seeks to recover losses incurred when St. Alexius improperly increased payments without compensating Humana and also failed to adjust certain discounts. Services Agreement §B5.1, entitled "Rate Protection," prohibited St. Alexius from increasing aggregate payments beyond contractually permitted amounts during each "Rate Year" (Count VI ¶5). That provision defined Rate Years as the four one-year periods between January 1, 1992 and December 31, 1995 (H. Ex. 3 §B5.1). Section B5.3 requires St. Alexius to pay Humana for any excess charges, and Section B5.4 requires Humana to pay St. Alexius for any undercharges (Count VI ¶6(second)).[4] Section B6, entitled

---

[3] St. Alexius was not an original party to the Services Agreement. Hoffman Estates Medical Center had provided medical services to Humana members (H. Mem. 14) until St. Alexius purchased the assets of that medical center in early 1999 (id.). By doing so St. Alexius assumed Hoffman Estates Medical Center's rights and obligations under the Services Agreement (id.).

[4] Humana's paragraphs following Count VI ¶6 are numbered incorrectly due to a clerical error (the inclusion of two

5

"Discount Adjustments," provides a formula to calculate discount rates (Count VI ¶7). Section B6.2 specifies that such discount adjustments became effective at the beginning of Rate Year 2 and Rate Year 3. St. Alexius has not paid Humana rate protection amounts since 1995 (Count VI ¶8), nor has St. Alexius adjusted discounts for charge-based services since then (Count VI ¶9). That conduct has damaged Humana in excess of $1 million (Count VI ¶11).

In Count VII, the last counterclaim against St. Alexius, Humana asks to recover payments that St. Alexius received but was not entitled to keep. Section B1 of the Services Agreement specifies "[d]eductions will be made for any charges of non-covered services." Yet during the term of the Services Agreement St. Alexius accepted and retained $17,625 in payments for non-covered services (Count VII ¶6).

In Counts VIII-X (the final set of counterclaims) Humana contends that Alexian Medical Center breached provisions of a Hospital Participation Agreement ("Participation Agreement").[5] Under that agreement Alexian Medical Center provides and arranges

_____

paragraphs bearing the number "6"). To avoid confusion, the citations here conform to Humana's mistaken numbering.

[5] Although Counts VIII-X mistakenly refer to that document as a "Hospital Services Agreement," the contract itself (H. Ex. 4) is entitled "Hospital Participation Agreement." Humana caught its original error in its responsive memorandum, and this opinion will do the same.

for medical and health care services for Humana members in Elk Grove Village and surrounding Cook County communities (Count VIII ¶¶3-4).

Humana bases Count VIII on two Participation Agreement provisions. In Section 7.3 Alexian Medical Center agreed to notify Humana of any rate increases that it initiated (Count VIII ¶5). Section 7.2 required Alexian Medical Center to discount its rates to Humana if the hospital had to increase rates, thus ensuring that Humana would pay no more than it would have if the rate increase had never occurred (Count VIII ¶6). Nevertheless, when Alexian Medical Center increased its usual rates from 1993 to December 2001 it did not provide Humana with notice as to those rate increases (Count VIII ¶¶7-8) or discount its rates to Humana, hence failing to obtain payment from Humana at pre-increase levels (Count VIII ¶9). Humana seeks to recover in excess of $3 million in damages attributable to Alexian Medical Center's breach of Sections 7.2 and 7.3 (Count VIII ¶10).

Count IX addresses an amendment effective January 1, 1995 by which Humana and Alexian Medical Center significantly altered the Participation Agreement billing procedures. Under the amended payment structure Alexian Medical Center was required to charge reduced per diem rates when the number of inpatient days exceeded 1500 in a calendar year (Count IX ¶5). Although inpatient days did exceed 1500 during the 2000 and 2001 calendar years (Count IX

7

¶¶7 and 10), Alexian Medical Center still charged and accepted payment at the higher per diem rates (Count IX ¶¶8 and 11). Alexian Medical Center's failure to adjust per diem rates damaged Humana in the sums of $294,700.20 for the 2000 calendar year and $150,428 for the 2001 calendar year (Count IX ¶¶9 and 12). Humana seeks to recover those losses in Count IX.[6]

Count X, Humana's final counterclaim, mirrors Count VII--but against a different target. Alexian Medical Center was also contractually bound to not accept payment for non-covered services (Count X ¶5). But it accepted payments from Humana for such services in the amount of $28,351 (Count X ¶8).

### Count I

For Humana to state a breach of contract claim under Illinois law,[7] Priebe v. Autobarn, Ltd., 240 F.3d 584, 587 (7th Cir. 2001), quoting Hickox v. Bell, 195 Ill. App. 3d 976, 992, 552 N.E.2d 1133, 1143 (5th Dist. 1990), requires that it show:

> (1)the existence of a valid and enforceable contract;
> (2) the performance of the contract by [Humana]; (3)
> the breach of the contract by [Alexian]; and (4) a
> resulting injury to [Humana].

Two of those elements--the existence of a valid and enforceable contract and Humana's performance of that contract--are not

---

[6] Although the SACc details the amounts for both years, Humana's prayer for relief inexplicably asks to recover only the losses incurred in 2001.

[7] Neither party disputes that Illinois substantive law applies.

disputed here.  At issue is whether Alexian Association breached the amended IPA Agreement.

Initially Alexian Association moves to dismiss Count I on the ground that Humana "fails to adequately allege wrongful termination" (A. Mem. 3).  That contention stems from the mistaken notion that conclusory allegations are insufficient, with Humana required instead to plead facts to show how the termination of the Commercial HMO breached the amended IPA Agreement (A. Mem. 3-4).  But <u>Jackson v. Marion County</u>, 66 F.3d 151, 153 (7th Cir. 1995) is exemplary of the many cases that teach otherwise:

> But apart from the rule [Rule 9] itself and a tiny handful of arguably appropriate judicial supplements to it, a plaintiff in a suit in federal court need not plead facts; he can plead conclusions.

See also App. ¶2 to <u>State Farm Mut. Auto. Ins. Co. v. Riley</u>, 199 F.R.D. 276, 279 (N.D. Ill. 2001).[8]

Here Count I sufficiently allows Alexian Association "to understand the gravamen" of Humana's counterclaim (<u>Scott v. City</u>

---

8    Indeed, it is really distressing to find any lawyer, let alone one from a long-established major law firm, still citing cases from the 1980s that called for fact pleading and other mistaken pleading standards (see A. Mem. 2 and A.R. Mem. 2)--a time when our Court of Appeals was, to be sure, sometimes speaking in those erroneous terms.  After all, it is ten years since a unanimous Supreme Court corrected that misapprehension in <u>Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163 (1993), and our Court of Appeals has long since followed suit.  To be wholly fair, though, it is possible to cite a few more recent opinions from district courts that continue to repeat such outmoded doctrines.

of Chicago, 195 F.3d 950, 952 (7th Cir. 1999), quoting from
Doherty v. City of Chicago, 75 F.3d 318, 326 (7th Cir. 1996)).
Humana plainly alleges that the Alexian participation in the
Commercial HMO was in exchange for, and a condition of, Humana's
agreement to forgive the Institutional Fund deficit (Count 1
¶10). Although to be sure Alexian Association may dispute any
breach of the amended IPA Agreement, that does not impair the
adequacy of the counterclaim for the purposes of notice pleading.

Scott, 195 F.3d at 952 further instructs that the existence
of notice "is determined by looking at the complaint as a whole."
Count I ¶11 refers to the amended IPA Agreement's Attachment F,
which specifies that the contract's term "shall be for nineteen
months (19) from the effective date of this Amendment"--until
December 31, 2001. When Count I ¶12 states Alexian Association
"wrongfully terminated its participation in the Humana Commercial
HMO plan on June 1, 2001," it clearly communicates the claim that
such termination contravened Attachment F.

Before amendment, Attachment F had provided that "[e]ither
party may terminate this Agreement without cause" upon 90 days'
written notice (H. Ex. 1). But that was changed by the amendment
to limit Alexian Association's ability to terminate the
agreement, permitting termination only "for cause if HUMANA fails
to make payments required under this AGREEMENT." In addition the
amendment required Alexian Association to give Humana at least 30

10

days to cure any default in payment and thus avoid termination. By characterizing Alexian Association as having "wrongfully terminated" the Commercial HMO, Humana has effectively asserted that the termination did not fit within that limitation. In sum, Humana has included both direct and inferential allegations as to Alexian Association's breach. To require more facts at this threshold stage would equate to a heightened pleading standard that (as n. 8 has said) has been soundly and definitively rejected, most recently in the unanimous decision in <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 512-15 (2002).

Alexian Association next contends that Count I should be dismissed because Humana forgave the Institutional Fund deficit, not in exchange for Alexian Association's participation in the Commercial HMO but by reason of its full performance under the Medicare HMO (A. Mem. 4). Alexian Association argues at A. Mem. 4-5 that the amended IPA Agreement supports its position and that the parol evidence rule and merger doctrine bar the introduction of any extrinsic evidence to contradict these opening recitals:

> WHEREAS, Alexian Brothers Health Providers [Alexian Association] desires HUMANA'S waiver of [Institutional Fund] deficits incurred between October 1, 1998 and May 31, 2000 due from Alexian Association under the terms of the existing AGREEMENT, and
>
> WHEREAS, in turn Humana desires to secure participation in the Medicare HMO through July 31, 2000 at the terms contained herein, and

11

> WHEREAS, HUMANA desires Alexian Providers's continued participation in the Commercial HMO's through December 31, 2001, in turn Alexian Association desires a $3.60 capitation adjustment effective June 1, 2000 through the term of the contract.

Humana counters that Alexian Association's termination of the Commercial HMO was a material breach that excused Humana from its waiver of the Institutional Fund deficit under the principle that a material breach of an agreement may excuse the other party's duty of counterperformance (see, e.g., this Court's opinion in Beverage Realty, Inc. v. Chatham Club, LLC, No. 01 C 1396, 2003 WL 444572 (N.D. Ill. Feb. 21)). Humana also argues that Alexian Association's participation in the Commercial HMO was a condition integrally related to Humana's forgiveness of the Institutional Fund deficit. Humana seeks to invoke extrinsic evidence to support its position.

Contract interpretation in Illinois follows the "four corners" rule (Air Safety, Inc. v. Teachers Realty Corp., 185 Ill. 2d 457, 462-63, 706 N.E.2d 882, 884 (1999)). As Air Safety, id. (internal citations omitted) explains:

> In applying this rule, a court initially looks to the language of the contract alone. If the language of the contract is facially ambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence. If, however, the trial court finds that the language of the contract is susceptible to more than one meaning, then an ambiguity is present. Only then may parol evidence be admitted to aid the trier of fact in resolving the ambiguity.

Whether a contract is ambiguous is a question of law for decision by the court (<u>Houben v. Telular Corp.</u>, 231 F.3d 1066, 1072 (7th Cir. 2000)). Mere disagreement between the parties as to the proper construction or application of a contract does not itself create ambiguity (<u>Kaplan v. Shure Bros., Inc.</u>, 266 F.3d 598, 605 (7th Cir. 2001)). Determining the parties' intent is the "primary objective" in construing a contract (<u>id</u>. at 604, quoting <u>Owens v. McDermott, Will & Emery</u>, 316 Ill. App. 3d 340, 344, 736 N.E.2d 145, 150 (1st Dist. 2000)). And to that end the contract must be read as a whole (<u>Kehoe v. Commonwealth Edison Co.</u>, 296 Ill. App. 3d 584, 590-91, 694 N.E.2d 1119, 1123 (1st Dist. 1998)).

If then the amended IPA Agreement "is reasonably susceptible to different constructions" (<u>Kaplan</u>, 266 F.3d at 605), that ambiguity would allow the use of extrinsic evidence to determine the intent of Humana and Alexian Association. In that respect Alexian Association attempts to separate the contractual strands by urging that Humana forgave the Institutional Fund deficit in exchange for Alexian Association's participation in the Medicare HMO and not in the Commercial HMO.

There is something to be said on each side of that issue because of the nonparallel construction of the amendment's "Whereas" recitals. In support of Alexian Association's position, the repeated use of the words "in turn" could be argued

13

to carry the implication that what follows those words is the quid pro quo for what precedes it, and that alone. On the other side of the coin are such considerations as (1) the notion that such an intention would normally have been manifested by combining those "desires" of the parties into a single "Whereas" recital (as was done in the third "Whereas" clause dealing with the Commercial HMO), rather than separating them into two recitals, and (2) the more fundamental notion that the entire amendment could and should be read as an integrated whole, rather than as embodying two wholly discrete sets of promises. In that respect SACc ¶8 and its Ex. 2 (the latter being the parties' May 15, 2000 letter agreement that spelled out the parties' total undertakings, which were then formally embodied in the amendment to the IPA Agreement) strongly support the idea of one total agreement rather than two separate ones, as Alexian Associates would have it.[9]

With the latter reading of the contract certainly being a permissible one at a minimum, it must be said that it "is susceptible to more than one meaning" and thus ambiguous (<u>Air Safety</u>, 185 Ill.2d at 462, 706 N.E.2d at 884)).[10] Because more

---

[9] Of course these observations are not findings of fact. Rather they go to the question whether the language of the amendment is ambiguous.

[10] This determination also torpedoes Alexian Association's two remaining Count I arguments, each of which also hinges on its reading of the amendment:

is needed to ascertain the parties' intent, Alexian Association's motion to dismiss Count I is denied.

## Count II

After Alexian Association terminated its participation in the Commercial HMO on June 1, 2001, Humana entered into agreements with new providers at rates higher than those specified in the IPA Agreement. As a result, Humana paid more than $725,000 in excess of what it would have paid had Alexian Association continued the Commercial HMO through the term of the agreement.

Alexian Association moves to dismiss Count II on two grounds. First, it argues that Humana fails adequately to allege wrongful termination. That position has been rejected earlier. Second, it contends that it cannot determine if the discounted rates were for the Commercial HMO or Medicare HMO enrollees. But Humana specifies that it sustained damages "during the period June 1, 2001 through December 31, 2001" (Count II ¶10). Because that is the contractual period that had remained under the Commercial HMO, it is more than clear that the discounted rates

---

1. It relatedly contends that the damages claimed by Humana did not result from the breach because Humana waived the Institutional Fund deficit in exchange for Alexian Providers's participation in the Medicare HMO.

2. It also argues that Humana seeks to rescind the amended IPA Agreement but fails to plead the elements of rescission.

were for Commercial HMO enrollees--indeed, the argument as to lack of clarity is really frivolous.[11] Accordingly, Count II also states a claim upon which relief may be granted, and Alexian Association's motion to dismiss that count is denied as well.

### Count III

In addition to going after the rate payments made during the seven months after Alexian Association terminated its participation in the Commercial HMO, Humana also seeks to recoup the adjusted capitation rates that it paid during the 12 months preceding that termination. As with the two earlier counts, the contention that Humana has failed adequately to allege breach of contract fails in light of federal notice pleading standards. But Alexian Association raises additional arguments for dismissal that require more attention.

Alexian Association labels Count III as a claim for partial rescission because Humana seeks "recovery under the rate in effect prior to the Amendment" (A. Mem. 8). It then moves to dismiss that count because Humana fails to plead the elements of rescission. Alexian Association also observes that Humana is asking to recoup payments made during a period when Alexian Association fulfilled its contractual obligations. In response

---

[11] Both parties recognize that Alexian Association fulfilled its obligations with respect to the Medicare HMO, so that "wrongful termination" and "discounted rates" necessarily relate to the Commercial HMO.

Humana both rejects the rescission label and asserts that Alexian Association's premature and contract-violative termination of the Commercial HMO discharged Humana's liability for the adjusted capitation rates paid during the pretermination period of June 1, 2000 to May 31, 2001.

Although Alexian Association's breach would surely discharge Humana's liability for the adjusted capitation rates thereafter, this Court perceives no predicate for a like result as to the rate payments made between June 1, 2000 and May 31, 2001 while the agreement was still in force.[12]  In exchange for adjusted rate payments during that period, Humana received the benefit of Alexian Association's participation in the Commercial HMO, and it does not allege that Alexian Association's performance was inadequate.

Moreover, despite its protestations, Humana's effort to turn the clock back equates to an effort to rescind the amended IPA

_____

[12] Humana wrongly seeks to characterize Alexian Association's breach as a "condition subsequent" that excused Humana's duty to pay the adjusted capitation rates for the pre-breach period.  To be sure, a condition subsequent is an event that, if it occurs, discharges preexisting contractual liability (Vuagniaux v. Korte, 273 Ill. App. 3d 305, 309, 652 N.E.2d 840, 842 (1995)).  But here that liability would be limited to Humana's duty to continue paying adjusted capitation rates, not an entitlement to the recoupment of payments made in exchange for Alexian Association's earlier performance in compliance with the contract.

Agreement.[13]  To state a proper claim for rescission and obtain
the relief it seeks, Humana must show not only that Alexian
Association breached the amended IPA Agreement but also that the
parties can be placed in the status quo ante (Wilkonson v.
Yovetich, 249 Ill. App. 3d 439, 445-46, 618 N.E.2d 1120, 1125
(1st Dist. 1993)).  Humana does not and cannot allege that the
parties can be restored to their pre-amended IPA positions, for
it has benefitted from Alexian Association's proper period of
performance in the Commercial HMO and cannot fairly be returned
to its pre-amendment position at bargain rates.

It is true, as already held regarding earlier counts, that
Humana need not plead facts or the elements of a claim (Walker v.
Thompson, 288 F.3d 1005, 1007 (7th Cir. 2002)).  And "specifying
an incorrect theory is not fatal" to a claim (Bartholet v.
Reishauer A.G. (Zurich), 953 F.2d 1073, 1078 (7th Cir. 1992)).
But that does not excuse the failure to state a claim upon which
relief may be granted, and Humana has failed here.  Count III is
dismissed.

_____

[13] H.R. Mem. 10 asserts that Count III is not a rescission
claim because it does not seek to void the Amendment but rather
"seeks recovery for Alexian Association's breach of contract
which occurred [after] negotiating the terms of the Amendment."
That position is belied by the relief that Humana seeks.  Its
premise is that Alexian Association's breach discharged Humana's
duty to pay increased rates, causing a return to the pre-amended
IPA Agreement rates.  That is the essence of a rescission theory,
because Humana wants to cancel the amended IPA Agreement and "to
restore the parties to their initial status" (Puskar v. Hughes,
179 Ill. App. 3d 522, 528, 533 N.E.2d 962, 966 (2d Dist. 1989)).

## Count IV

In 1997 an amendment to the IPA Agreement introduced a provision (quoted in Count IV ¶7) that allowed Humana to make payments for claims attributable to the Medical Fund:

> In the event HUMANA receives claims for services
> described in Exhibit D-1, HUMANA shall transfer such
> claims to the IPA for processing.  IPA shall have
> fifteen (15) days from the date of transmission of such
> claims to notify HUMANA of its intent to pay, deny,
> pend for additional information, or resubmit the claim
> to HUMANA.  In the event IPA fails to inform HUMANA of
> its decision on a claim within the fifteen (15) day
> period, HUMANA may elect to pay such claim and deduct
> such payment from any capitation payments owed to IPA.
> IPA shall have no recourse to dispute any payments made
> by HUMANA, pursuant to the terms herein, after fifteen
> (15) days have elapsed from the date of transmission of
> such claim.  Such payments and deductions shall be
> subject to retroactive adjustments in accordance with
> the terms of this AGREEMENT.

Since September 1998 Humana has paid $276,950 in claims pursuant to that provision.  Humana emphasizes that such claims were Alexian Association's responsibility, and it now seeks to recoup that sum.

Alexian Association presents three grounds for dismissal. First, it argues that the absence of any contractual provision obligating it to pay Humana requires dismissal. Second, it contends that the contractual language shows that any entitlement on Humana's part to deduct the payments was limited to amounts due to Alexian Association. Third, it asserts that the voluntary payment doctrine bars the claim. Because the first two grounds

focus on the contractual language, they are discussed together, followed by a separate consideration of the third ground.

To begin with, Alexian Association's claim that it had no duty to pay Humana contradicts the purpose of the IPA Agreement: the prompt payment of Medical Fund claims. That goal was served by effectively encouraging Humana to pay claims that it received, with the assurance that it would be reimbursed for those payments through deductions from future payments:

> 1. Alexian Association had the express primary obligation to pay Medical Fund claims.
>
> 2. If Humana received a Medical Fund claim, the IPA Agreement allowed it to make the payment so long as Alexian Association had been given the opportunity to review the claim but did not act on it swiftly. Humana was then entitled to deduct the payment from any outstanding capitation payments owed to Alexian Association.

That sequence provided a vehicle by which Alexian Association effectively reimbursed Humana. It would be totally unjust, and would violate the underlying goal of honoring Medical Fund claims promptly, if a disincentive to Humana payments were injected by conditioning Humana's recoupment right on the existence of an obligation to make capitation payments at the time. Instead the only fair reading of the contract is to treat Alexian Association's duty to reimburse Humana in all events

after the latter paid Medical Fund claims as implicit in the IPA Agreement.

As for the second issue, both the IPA Agreement and the Medical Fund amendment state that payments and deductions made by Humana are subject to "retroactive adjustments." Unlike the Medical Fund amendment, the IPA Agreement confers the authority to make those adjustments on Humana and not on Alexian Association (H. Ex. 1 ¶23). Humana says that its request for direct payment, instead of making a deduction from capitation payments, is a "retroactive adjustment"--a reading that certainly does no violence to the plain meaning of that term.[14] In sum, neither of Alexian Association's first two bases for Count IV's dismissal proves that Humana has failed to state a claim and is thus not entitled to relief.

Finally, Alexian Association characterizes Humana's payments of Medical Fund claims as nonrecoverable under the voluntary payment doctrine. Ill. Graphics Co. v. Nickum, 159 Ill.2d 469, 497, 639 N.E.2d 1282, 1295 (1994) describes that doctrine:

---

[14] A. R. Mem. 13 contends that the power to make "retroactive adjustments" simply allowed Humana to reduce payments. But that position brings nothing substantive to the analytical table, for the existence of that power does not foreclose Humana's proposed meaning: that by deducting Medical Fund payments from capitation payments owed, Humana reduced the payments it made. Because the meaning of the term depends at worst on further inquiry, it cannot be resolved against Humana at this stage.

> The rule is that in the absence of fraud, misrepresentation, or mistake of fact money voluntarily paid under a claim of right to the payment, with full knowledge of the facts by the person making the payment, cannot be recovered unless the payment was made under circumstances amounting to compulsion.

As stated there, the most traditional defenses to the voluntary payment doctrine are fraud and mistake of fact (Randazzo v. Harris Bank Palatine, N.A., 262 F.3d 663, 668 (7th Cir. 2001)), in addition to which "Illinois law also provides for the recoupment of payments made under duress for items deemed to be necessities" (id. at 669 n.1). Unlike the mistake-of-fact situation, payments made due to mistakes of law are not recoverable (id. at 668).

According to Alexian Association, the voluntary payment doctrine applies because Medical Fund claims for medical services qualified as claims of right to payment and Humana does not allege anything of which it was unaware when it paid those claims. Further, it says that Humana cannot escape the voluntary payment doctrine because it fails to allege fraud, coercion or mistake of fact. In support of its assertions it cites Commercial Union Ins. Co. v. Keebler Co., No. 89 C 8405, 1990 WL 93324 (N.D. Ill. June 20) and Hartford v. Doubler, 105 Ill. App. 3d 999, 434 N.E.2d 1189 (3d Dist. 1982). Humana counters that the doctrine is inapplicable because the payments were not made under a claim or demand by Alexian Association.

But to pitch the debate in those terms really misses the point, for the situation at hand does not at all conform to the types of facts that bring the doctrine into play to begin with. In this instance Humana had an express contractual right to make the Medical Fund claims if Alexian Association failed in its own duty to pay them promptly--and that right was coupled with a right to recapture the funds so advanced from Alexian Association, a clear confirmation that the payments were really made on Alexian Association's behalf. For the reasons already stated, then, Humana can fairly contend that its making of the payments was instinct with an obligation of reimbursement on the part of Alexian Association under the amended IPA Agreement. In those terms the voluntary payment doctrine simply does not enter the picture at all.

Each avenue of potential attack on Count IV has thus been closed off. Alexian Association's motion to dismiss that count is denied.

### Count V

Count V alleges that St. Alexius breached the Services Agreement when it "wrongfully accepted and retained payments from Humana in excess of agreed contractual rates" (Count V ¶6). St. Alexius argues (1) that Humana failed to identify any part of the Services Agreement that obligates it to pay Humana and (2) that

the voluntary payment doctrine bars Humana's counterclaim for recovery in any event.

In response to that first argument Humana has alleged that the Services Agreement required St. Alexius to accept "as payment in full the rates set forth in Attachment B...and its accompanying schedules" (Count V ¶5). It was by collecting amounts in excess of those rates that St. Alexius assertedly breached the contract. Those allegations adequately put St. Alexius on notice as to the gravamen of Humana's cause of action.

As for the voluntary payment doctrine, Humana contends that nothing in the pleadings shows (1) that Humana's payments were made pursuant to a claim or demand by St. Alexius or (2) that Humana had full knowledge of facts. By negating the existence of those two factors, Humana attempts to show that the voluntary payment doctrine is inapplicable.

Humana's first response--that St. Alexius' payment requests were not "claims of right"--is not in step with cases applying the voluntary payment doctrine. Charges for cellular phone service (Dreyfus v. Ameritech Mobile Communications, Inc., 298 Ill. App. 3d 933, 940, 700 N.E.2d 162, 167 (1st Dist. 1998), billing for cable television pay-per-view service (Smith v. Prime Cable of Chicago, 276 Ill. App. 3d 843, 855, 658 N.E.2d 1325, 1334 (1st Dist. 1995) and claims made by insured individuals to their insurers (Cohn v. Anthem Life & Health Ins. Co., 965 F.

Supp. 1119, 1123 (N.D. Ill. 1997) and Hartford, 105 Ill. App. 3d at 1002, 434 N.E.2d at 1192) have all been held claims of right to payment. By parity of reasoning, St. Alexius' requests for payments for medical services it provided are likewise claims of right to payment for voluntary payment doctrine purposes.

As for Humana's second point, while it has not pleaded itself out of court by acknowledging that it had sufficient knowledge of the facts, neither has it necessarily negated the possible applicability of the voluntary payment doctrine by omitting any allegation that it did not have such full knowledge. Incomplete knowledge of facts can contribute to the mistake of fact exception to the voluntary payment doctrine, as described in Ill. Graphics, 159 Ill.2d at 490, 639 N.E.2d at 1292:[15]

A recognized exception to this long-standing rule provides that where money is paid under mistake of fact, which would not have been paid had the facts been known to the payor, such money may be recovered.

Although Humana does not plead either lack of knowledge or mistake of fact in its SACc, it would be improper at this early stage to hold that the voluntary payment doctrine bars Count V. Kerr S.S. Co. v. Chicago Title & Trust Co., 120 Ill. App. 3d 998,

---

[15] Ill. Graphics, 159 Ill.2d at 490-93, 639 N.E.2d at 1293 inferred a mistake-of-fact claim in the complaint there even though the plaintiff there never specified that its claim was based on "mistake of fact." Detailed allegations in the complaint made that inference possible. Because Humana's SACc is properly devoid of similar details under federal notice pleading principles, this Court cannot now infer a claim predicated on mistake of fact.

1008, 458 N.E.2d 1009, 1016 (1ˢᵗ Dist. 1983) reversed the
dismissal of Kerr's action to recover overpayments because "the
determination as to why the payments were made is a factual
determination not properly decided on a motion to dismiss." If
Humana can bring itself within any of the exceptions to the
doctrine, it could be entitled to relief.[16] While St. Alexius
may ultimately establish a viable defense via the voluntary
payment doctrine, it is premature to dismiss Count V pending
further factual development.[17] Hence St. Alexius' motion to
dismiss Count V is denied too.

### Count VI

Here Humana claims that St. Alexius breached the Services
Agreement by failing to adjust discounts and to pay rate
protection as required by Services Agreement §§B5 and B6. St.
Alexius presses for the dismissal of Count VI because those
sections expired in 1995 and Humana has not shown that those
provisions remained in force thereafter. Humana does not dispute
that those provisions expired by their literal terms--it responds

---

[16] Looking to Humana's memorandum to flesh out its SACc is
justified in this situation, where the voluntary payment doctrine
is an affirmative defense that St. Alexius raises in its motion
to dismiss. Humana's response to that affirmative defense is
necessarily found in its memorandum.

[17] In contrast, courts that have found full knowledge of
facts have reached that conclusion with the aid of far more
complete records (see, e.g., Hartford, 105 Ill. App. 2d at 1002,
434 N.E.2d at 1191-92).

instead that the parties "impliedly renewed" the provisions by their conduct. According to Humana, dismissing Count VI would be improper because whether the provisions were impliedly renewed presents questions of fact.

Humana dedicates much of its argument to St. Alexius' own claims based on Services Agreement §B7, in an effort to show that St. Alexius itself believed the parties had impliedly renewed the contract. But Humana has not accurately depicted St. Alexius' Section B7 claim, and it relatedly fails to show how that claim supports its implied renewal argument.[18]

Humana is of course correct that parties to a contract may renew an expired contract when they continue to act in conformance with its provisions.[19] But Count VI does not speak in those terms at all, instead citing to and quoting from contractual obligations that ran out by their own terms in

---

[18] Humana attempts to show that its counterclaims and St. Alexius' claims are "interdependent." But the provisions under which the parties assert their respective claims under are not "inextricably intertwined": Instead the separate provisions cover different periods of time and use entirely different and independent methods to calculate payments.

[19] It is noteworthy that each of the cases Humana cites in support of its implied renewal argument involved a contract that included renewal options (PP&K, Inc. v. McCumber, No. 94 C 988, 1994 WL 69417, at *4 (N.D. Ill. Feb. 25); Hawes Office Sys., Inc. v. Wang Labs., Inc., 537 F. Supp. 939, 942 (E.D.N.Y. 1982); Servicemaster Residential Commercial Servs. L.P. v. Westchester Cleaning Servs., Inc., No. 01 Civ. 2229 (JSM), 2001 WL 396520, at *2 (S.D.N.Y. April 19)).

1995.[20] This is not to impose on Humana a nonexistent
requirement to plead evidence (<u>McCormick v. City of Chicago</u>, 230
F.3d 319, 325 (7th Cir. 2000))--rather "it is axiomatic that the
complaint may not be amended by the briefs in opposition to a
motion to dismiss" (<u>Car Carriers, Inc. v. Ford Motor Co.</u>, 745
F.2d 1101, 1107 (7th Cir. 1984)). In short, because St. Alexius'
obligations expressly expired in 1995, Humana's attempted
enforcement for later periods in the teeth of the contract's
plain language must fail. Count VI insufficiently alleges a
breach of contract, and it is dismissed.

### Count VII

Services Agreement §B1 describes the billing and payment
methodology used by Humana and St. Alexius, specifying that
"[d]eductions will be made for any charges for non-covered
services." It also authorizes St. Alexius to "collect directly
from the patient for non-covered services" (<u>id</u>.). Humana argues
that St. Alexius "wrongfully accepted payments for non-covered
services" (Count VII ¶6) and "failed and refused to reimburse
Humana" (Count VII ¶7). Once again St. Alexius raises the
voluntary payment doctrine as a bar to recovery.

---

[20] That is not affected by the guidelines in Services
Agreement §4.3 for post-termination or post-expiration conduct.
That section requires St. Alexius to continue providing services
under Coverage Contracts and obligates Humana to pay St. Alexius
for those services.

St. Alexius is correct that it did not breach the Services Agreement merely by accepting payments for non-covered services, for as already stated Section B1 says that "HOSPITAL may also collect directly from the patient for non-covered services." And even if acceptance of those payments did constitute a breach of the agreement, the money may not be recoverable because of the voluntary payment doctrine. Under that doctrine money cannot be recovered "solely because the claim was illegal," provided that the payor paid under a claim of right to payment and with knowledge of facts (Smith, 276 Ill. App. 3d at 847, 658 N.E.2d at 1329). Thus payments are not recoverable solely because accepting them contravened a contractual provision.

But St. Alexius' failure to reimburse Humana for payments for non-covered services is inconsistent with the requirement to deduct such charges. Similar to Count IV, it is possible to conceive a set of facts where the voluntary payment doctrine does not bar recovery. In that scenario Humana does not claim that the payment for non-covered services was wrong or in error and then seek to recoup that payment. Instead it attempts to enforce the deduction provision of the agreement. Because such a scenario can be reasonably inferred from the SACc, St. Alexius' motion to dismiss Count VII is denied.

## Count VIII

Participation Agreement §7.2 shielded Humana from exposure to rate increases instituted by Alexian Medical Center:

> In the event that HOSPITAL institutes a rate increase for its services during the term of this Agreement, HOSPITAL shall discount these rates to HUMANA so that no higher payment shall be paid by HUMANA than it would have paid had such rate increase not taken place.

In the event of any rate increase, Section 7.3 imposed this obligation on Alexian Medical Center:

> HOSPITAL agrees to notify HUMANA in writing of the date and amount of any increase in its usual and customary charges no later than the effective date of the increase.

For its part, Humana asserts that Alexian Medical Center violated both those provisions by "substantially increasing" rates from 1993 to 2001, failing to provide notice of those increases (Count VIII ¶8) and failing to discount rates after those increases (Count VIII ¶9). Alexian Medical Center retorts by labeling that claim as one seeking "alleged claim overpayments" and arguing that dismissal is proper because Participation Agreement §9.3 bars recovery for "monies owed that are a result of claims incurred received by Humana older than twelve (12) months."

Humana replies that the quoted time limit is in a section that sets out procedures and guidelines for deducting monies owed because of overpayments on individual claims, as contrasted with Participation Agreement §7, which covers general rate increases

for services provided by Alexian Medical Center. In the alternative Humana argues that even if Section 9.3 were potentially in play, its one-year period would be tolled once the issue of "monies owed" was raised with Alexian Medical Center informally, eliminating any need to file a complaint within that window. Finally, Humana contends that because Section 9.3 is not an exclusive remedy, it may limit the use of a setoff but does not preclude Humana from seeking alternative remedies such as damages.

Those arguments present reasonable factual inferences that could entitle Humana to relief.[21] Humana does not need to settle on one legal theory at this point (LaPorte County Republican Committee v. Board of Comm'rs, 43 F.3d 1126, 1129 (7th Cir. 1994)). And it is far from clear that Participation Agreement §9.3 has any impact that would bar claims under Sections 7.2 and 7.3. Whether it does or does not will have to be resolved later. Alexian Medical Center's motion to dismiss Count VIII is denied.

----

[21] Alexian Medical Center fails to rebut Humana's arguments. Its A.R. Mem. 18 asserts that Humana must have known about the rate increases: "How could Humana have paid a rate it had no notice of? Humana offers no solution to this puzzle." But Humana's knowledge of the rate increases is not the issue. Humana rather claims that Alexian Medical Center failed to provide notice and failed to deduct the increases, both of those failures having flouted its own contractual commitments.

<u>Count IX</u>

Count IX claims that Alexian Medical Center also violated a
1995 amendment to Attachment B of the Participation Agreement,
which required Alexian Medical Center to charge lower per diem
rates when the total number of inpatient days exceeded 1500.
Here too Alexian Medical Center urges that Section 9.3 bars
recovery for claims more than 12 months old, and it also argues
that it is unclear whether Count IX includes a claim for calendar
year 2000.

Just as with Count VIII, Humana asserts that Section 9.3
does not apply to the amended Attachment B. Attachment B sets
forth general billing rates for hospital services, and
Participation Agreement §7.1 specifically refers to Attachment B.
According to Humana, then, Section 9.3 does not apply to amended
Attachment B for the same reasons that make it inapplicable to
Section 7. This is not a case where "foolish consistency is the
hobgoblin of little minds," as Emerson put it--Count IX survives
just as Count VIII has.

As for Alexian Medical Center's second objection, Count IX
¶¶7-12 allege that inpatient days exceeded 1500 in both 2000 and
2001 and that Alexian Medical Center failed to adjust its per
diem rates in both years--and Count IX ¶¶9 and 12 quantify
Humana's damages for <u>both</u> years. Those allegations are in no way
"unclear." Even though Humana did not include the specified

32

damages for 2000 in its prayer for relief (an obvious oversight),
Alexian Medical Center's counsel have ignored the basic principle
that a prayer for relief is not as such a part of the claim for
relief (the same principle that underlies such decisions as
Bartholet). That makeweight objection is rejected as well.

### Count X

This final counterclaim looks to recover payments made for
non-covered services that Alexian Medical Center accepted.
Participation Agreement §5.2 obligates Humana to pay benefits
only for Hospital Service expenses covered by contract, while
Section 9.2 requires Alexian Medical Center to deduct payments
for non-covered services according to applicable Member
contracts. As might be expected from the similar claim in
Count VII, Humana argues that Alexian Medical Center's acceptance
of payments for non-covered services breached the Participation
Agreement, to which Alexian Medical Center responds that Count X
is "essentially identical" to Count VII and that the voluntary
payment doctrine bars recovery, and Humana then retorts with the
same objections to applicability of the voluntary payment
doctrine.

There is no need to repeat what has been said as to
Count VII--the same analysis is equally applicable here. Alexian
Medical Center's motion to dismiss Count X is denied.

## Conclusion

As already stated at length, Alexian's motion to dismiss Humana's Counterclaim is granted in part and denied in part. Only its Counts III and VI have failed to survive. Alexian is ordered to file its reply to all surviving counts on or before September 3, and this action is set for a next status hearing at 9 a.m. September 10, 2003.

Milton I. Shadur
Senior United States District Judge

Date: August 19, 2003