# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 271 | DATE | 8/6/2004 |
| CASE TITLE | Alexian Brothers vs. Humana Health Plan, Inc. | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Humana's summary judgment motion is granted (52-1), St. Alexius motion is denied(56-1), and First Amended Complaint Count VII is dismissed Whatever claims remain viable in this action will be addressed at the next (and previously scheduled) status hearing date of September 9, 2004.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | AUG 1 0 2004 date docketed | |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 8/9/2004 date mailed notice | |
| SN | courtroom deputy's initials | 2004 AUG 10 AM 7:59  U.S. DISTRICT COURT CLERK  Date/time received in central Clerk's Office | SN mailing deputy initials |

ALEXIAN BROTHERS HEALTH PROVIDERS )
ASSOCIATION, INC., et al.,       )
                                  )          DOCKETED
     Plaintiffs-Counterdefendants,)          AUG 1 0 2004
                                  )
     v.                           )   No. 02 C 271
                                  )
HUMANA HEALTH PLAN, INC., et al., )
                                  )
     Defendants-Counterplaintiffs.)

MEMORANDUM OPINION AND ORDER

This multiplaintiff multidefendant action involves a multiplicity of claims on behalf of one or more of the related plaintiffs, as well as counterclaims by one or more of the related defendants. Two of the defendants (Humana Health Plan, Inc. and Humana Insurance Company (collectively "Humana")) and one of the plaintiffs (St. Alexius Medical Center ("St. Alexius")) have filed motions for summary judgment under Fed.R.Civ.P.("Rule") 56 as to Count VII of the First Amended Complaint ("FAC"), and the parties' cross-submissions have now made the dispute ripe for disposition.

St. Alexius alleges in Count VII that Humana was contractually required to pay certain annual rate increases to St. Alexius or its predecessor but that Humana has failed to do so since March 1, 1996. Humana admits that it did not adjust its payment rates after that date, but it says that it was not contractually required to do so because the relevant contract

provision expired on March 1, 1996 and was never revived by a later agreement between the parties. Alternatively, Humana argues that the principles of waiver or equitable estoppel should bar St. Alexius from seeking those payment increases.

For the reasons stated in this memorandum opinion and order, this Court grants Humana's motion and denies St. Alexius' motion. Accordingly FAC Count VII is dismissed.

## Background[1]

Humana originally signed a Hospital Services Agreement (the "Agreement") with Suburban Medical Center at Hoffman Estates, Inc. ("Hoffman"), specifying the conditions under which Hoffman would provide medical services to persons covered by Humana's insurance policies. Agreement § 4.1 (entitled "Term and Termination") provided:

> The term of this Agreement ("Term") shall be for the three year period commencing on March 1, 1993.

Attachment B to the Agreement, which dealt with billing and payments, contained the following provisions for annual rate increases for non-medicare and medicare rates (emphasis added):

B7.1 Effective on January 1, 1994, and on each succeeding January 1 thereafter <u>during the Term</u>, the Non-Medicare fixed fees, per diem, case rates, and HUMANA's reimbursement rate to HOSPITAL for outpatient services described in Schedules 1 and 2 shall increase by the lesser of (i) the increase in the Hospital and Related Services Component of the Consumer

---

[1] Both sides agree to the underlying facts set out in this section, but they disagree as to what legal consequences should follow.

2

Price Index as reported by U.S. Bureau of Labor Statistics for the most recent available preceding 12 months, or (ii) the annualized percentage increase in premium prices for the most recent available preceding 12 month period, minus one percent, payable under HUMANA by groups in HOSPITAL's Market. If the Consumer Price Index is discontinued, a new applicable index will be defined to replace it.

* * *

B8  <u>During the Term</u>, the Medicare Risk Payment rates specified in Schedule 3 shall be adjusted by the same percentage adjustment in the Health Care Financing Administration's ("HCFA") Part A Adjusted Average Per Capita Cost Member - weighted average payment rate for HUMANA's Medicare Risk Members in HOSPITAL's market. Such adjustments shall be effective on the effective date HUMANA receives the adjusted payments from HCFA, with the next such adjustment date anticipated to be January 1, 1994.[2]

Humana increased its payment rates consistently with those obligations under Sections B7 and B8 in 1994, 1995 and 1996--but not in 1997.[3] On February 17, 1997 Humana and Hoffman signed a document entitled "Amendment to Agreement" ("1997 Amendment") that changed a few specific provisions of the original Agreement (none of those changes is relevant to this decision). It also stated:

All other terms and conditions of the Agreement except as hereby amended shall remain in full force and effect.

Hoffman thereafter continued to provide medical services for

---

[2] Further references to these and other provisions of Attachment B will take the form "Section --."

[3] In FAC Count VII St. Alexius alleges that Humana did not make any payment rate adjustments "since 1995," but it has not brought forward any evidence to support that allegation, nor has it pursued that argument in any of its summary judgment papers.

3

Humana's members, and Humana continued to pay Hoffman -- but at 1996 rates. At no time did Hoffman ever indicate to Humana that it believed it was entitled to any yearly rate adjustment after 1996. Their relationship continued through February 1, 1999, at which time Hoffman assigned all of its rights and obligations under the Agreement to St. Alexius.

In February 2000 some "reimbursement issues" arose between Humana and a number of medical providers, including St. Alexius (which did not advance a claimed right to yearly rate increases as one of those issues). In the course of discussion of those issues, St. Alexius' parent company, Alexian Brothers of Illinois, tendered a termination notice to Humana. After some further negotiation the parties appeared to resolve their disputes, and Alexian Brothers of Illinois agreed to withdraw its termination notice if Humana agreed to the conditions summarized in a May 15, 2000 letter (FAC ¶23). On June 6, 2000 Humana accepted the provisions outlined in the letter. For its part, St. Alexius agreed to "[c]ontinue participation in both Medicare and Commercial plans at their existing contract rates through December 31, 2001," with the reimbursement rate to increase by "no less than 6%" effective January 1, 2002 (FAC Ex. A).

Despite the parties' attempt to work through the reimbursement issues, the problems did not go away. So on November 30, 2001 St. Alexius and affiliated entities filed suit

4

in Illinois state court. St. Alexius alleged, among other things, that Humana had failed to provide the yearly rate increases as assertedly required under the original Agreement. On January 11, 2002 Humana removed the case to this federal court on diversity grounds.

## Summary Judgment Standards

Familiar Rule 56 principles apply to cross-motions for summary judgment just as they would to a one-party summary judgment motion (Int'l Bhd. Of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc., 293 F.3d 402, 404 (7th Cir. 2002)) -- that is, summary judgment is proper in favor of either party if the record demonstrates that there is no genuine issue of material fact and that party would be entitled to a judgment as a matter of law (id.). Taking each motion in turn, this Court must "consider the evidentiary record in the light most favorable to the non-moving party...and draw all reasonable inferences in his favor" (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). If a trier of fact could return a verdict for the non-moving party, the summary judgment motion should be denied (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)).

## Ambiguity Vel Non

Both parties agree that Illinois law controls, and under Illinois law (as probably everywhere else) an unambiguous contract provision must be enforced as written (Bank of Am. Nat'l

5

Trust & Sav. Ass'n v. Schulson, 305 Ill.App.3d 941, 945, 714 N.E.2d 20, 24 (1st Dist. 1999)). Ambiguity exists when key contract language is susceptible to more than one reasonable interpretation when the contract is read as a whole (Guerrant v. Roth, 334 Ill.App.3d 259, 264, 777 N.E.2d 499, 503 (1st Dist. 2002)). As the parties will recall from the last movie (277 F.Supp.2d 880, 887 (N.D. Ill. 2003)), the threshold determination of "[w]hether a contract is ambiguous is a question of law for decision by the court." But once the court determines that a provision is ambiguous, the construction of a particular provision becomes a question of fact, and summary judgment must be denied if extrinsic evidence exists such that a reasonable factfinder could construe the contract in the nonmovant's favor (Hernandez v. Schittek, 305 Ill.App.3d 925, 933, 713 N.E.2d 203, 209-10 (5th Dist. 1999); Taracorp, Inc. v. NL Indus., Inc., 73 F.3d 738, 743 (7th Cir. 1996)).

Humana argues that under a straightforward reading of the Agreement the annual rate increase provisions expired on March 1, 1996, so it had no obligation to increase the rates after that date. Both Sections B7 and B8 applied only "during the Term," which the Agreement expressly defined as "the three year period commencing on March 1, 1993." Humana recognizes that the 1997 Amendment set out the conditions of an ongoing contractual relationship and incorporated all the provisions of the original

Agreement that were not amended, but Humana contends that Sections B7 and B8 effectively expired on March 1, 1996 and that the 1997 Amendment did not revive them because that Amendment did not modify the definition of "Term."[4]

For its part, St. Alexius contends that because the 1997 Amendment unambiguously extended the Agreement's duration and said that the provisions of the Agreement that were not amended "shall remain in full force and effect," the annual rate increase provisions must have been extended along with the rest of the original Agreement's provisions. In essence St. Alexius maintains that Sections B7 and B8 did not have a duration separate from the Agreement as a whole. St. Alexius also notes that on February 1, 2002 (after this lawsuit had been brought) the parties deleted all of Attachment B and replaced it with new compensation rates, and it suggests that there is no rational explanation for that modification if the provisions contained in Attachment B had expired as Humana asserts.

But St. Alexius never addresses the fact that Sections B7 and B8 were expressly made operative "during the Term," which the Agreement just as expressly defined as the three year period

---

[4] Humana argues that the 1997 Amendment was incorrectly styled, for it did not actually amend the original Agreement but formed an entirely new contractual relationship that incorporated all of the Agreement's provisions that were not themselves amended. Although Humana is correct on that point, it is a distinction without a difference, because Humana's legal obligations remain the same either way.

7

commencing on March 1, 1993" -- a term[5] of art. As Humana rightly observes, parties to a contract may serve as their own lexicographers and may assign a particular meaning to any word they choose (Haslund v. Simon Prop. Group, Inc., 284 F.Supp.2d 1102, 1115 (N.D. Ill. 2003); Am. Nat'l Fire Ins. Co. v. Nat'l Union Fire Ins. Co., 343 Ill.App.3d 93, 103, 796 N.E.2d 1133, 1141 (1st Dist. 2003)). So if the meaning of "Term" was controllingly dictated by Agreement § 4.1 (and if that meaning was not then modified by the 1997 Amendment), this Court would of course have to enforce the parties' contract in terms of that meaning.

Even though St. Alexius fails to state its position in just this way, the 1997 Amendment's language that all terms and conditions that are not amended "shall remain in full force and effect" might actually be read to convey that once the Agreement § 4.1 definition of "Term" ceased to be operative, with the parties' relationship being replaced by an arrangement effective for an unspecified and indeterminate "term," the capitalization contained in "during the Term" in Sections B7 and B8 would also have been effectively supplanted by a lower case "during the term." Even though such a reading would be awkward (after all, the phase "during the term" normally has no ascertainable meaning by itself unless "term" is given some desired temporal context),

---

[5]Bad pun intended.

8

that possible reading would mean that Sections B7 and B8 would not have expired on March 1, 1996. In those terms St. Alexius could prevail on Count VII.

Sometimes the meaning of a word can become clear by examining how it is used throughout an integrated document. As La Throp v. Bell Fed. Sav. & Loan Ass'n, 68 Ill.2d 375, 381, 370 N.E.2d 188, 191 (1977) teaches:

> The intent of the parties to a contract must be determined with reference to the contract as a whole, not merely by reference to particular words or isolated phrases, but by viewing each part in light of the others.

Unfortunately, in this instance turning to other parts of the Agreement does not compel an answer either way. For example, the Agreement uses "Term" in its capitalized form at two other places, one that arguably supports St. Alexius' position that "Term" simply refers to the "term of the Agreement" generally (Agreement § 9.1) and one that arguably supports Humana's position that "Term" applies specifically to the three year period that began March 1, 1993 (Attachment B Schedule 4). But on the other hand, it is surely significant that an uncapitalized phrase "term of this Agreement" is scattered throughout the document, providing strong support for Humana's contention that on the few occasions when the parties used "Term" they did so advisedly to denote the defined and limited duration specified in Agreement § 4.1.

In sum, although the scales of ambiguity vel non tip substantially in favor of nonambiguity, so that Humana could well prevail at this threshold stage, there is at least some arguable force to St. Alexius' contrary contention that Sections B7 and B8 are sufficiently ambiguous to allow two possible readings: one that they expired on March 1, 1996, and the other that the 1997 Amendment extended the duration of Humana's obligation to provide annual rate increases. Because that contention is not wholly frivolous and because the next analytical step -- appropriate to take where ambiguity does exist -- supports Humana beyond dispute, this opinion proceeds to that next step.

Under Illinois law, "[w]here the express terms of the instrument are ambiguous, the parties' intentions can be determined from their declarations and conduct and from the surrounding circumstances" (Chandler v. Maxwell Manor Nursing Home, Inc., 281 Ill.App.3d 309, 322, 666 N.E.2d 740, 749 (1st Dist. 1996)). And all of the extrinsic evidence tendered to this Court in that regard strongly supports Humana's position.

It is undisputed that Humana increased its payment rates in 1994, 1995 and 1996, but that it stopped providing annual rate increases after the original Agreement expired on March 1, 1996. Neither St. Alexius nor its predecessor Hoffman ever once asserted that the 1997 Amendment somehow extended the "Term" -- or more specifically, extended the obligation to increase the

10

payment rates under Sections B7 and B8 -- beyond March 1, 1996.

And that is not simply a matter of Humana and St. Alexius' having failed to raise the issue as a matter independent of an ongoing and unmodified relationship between the parties: It will be recalled that the parties met at the bargaining table a number of times after that point to consider modifications of other aspects of their dealings, during which meetings St. Alexius could have raised the issue if it felt that Humana was not living up to its obligation -- but St. Alexius did not do so. In fact, not only did St. Alexius remain silent about Humana's making ongoing payments at the level of the 1996 rates, but in 2000 St. Alexius expressly reaffirmed that the rates would not change. It agreed to "[c]ontinue participation in both Medicare and Commercial plans at their existing contract rates through December 31, 2001." St. Alexius makes no effort to reconcile its position during all those years with its current attempt to force Humana to increase the rates retroactively.

Any reasonable factfinder could draw only one conclusion from the undisputed evidence as to the parties' conduct: that Humana's reading of the Agreement, including Sections B7 and B8, is the correct one. This Court therefore concludes as a matter of law that the Sections B7 and B8 provisions expired on March 1, 1996 and that Humana had no contractual obligation to increase its annual payment rates after that date.

11

## Laches

There is still another string to Humana's analytical bow, and it too leads to a bull's-eye by Humana striking the same target. That same evidence of the parties' conduct, as discussed at the end of the preceding section, also entitles Humana to summary judgment on its affirmative defense of equitable estoppel, more accurately labeled laches (a form of equitable estoppel--see Teamsters & Employers Welfare Trust v. Gorman Bros. Ready Mix, 283 F.3d 877, 882 (7th Cir. 2002)).

Bill v. Bd. of Educ., No. 1-03-2079, 2004 WL 1440664, at *4 (1st Dist. June 28) (internal quotation marks and citation omitted) defines laches as:

> the neglect or omission to assert a right which, taken in conjunction with a lapse of time and circumstances causing prejudice to the opposite party, will operate as a bar to a suit.

That defense requires proof (1) that the opponent failed to assert a right with reasonable diligence despite having actual or constructive knowledge of the right and (2) that the party asserting the defense suffered prejudice from the delay (Peddinghaus v. Peddinghaus, 314 Ill.App.3d 900, 907, 733 N.E.2d 797, 802 (1st Dist. 2000); La Salle Nat'l Bank v. Dubin Residential Cmties. Corp., 337 Ill.App.3d 345, 352, 785 N.E.2d 997, 1002 (1st Dist. 2003)).[6]

---

[6] Historically laches had been limited to equity cases (see Makysm v. Loesch, 937 F.2d 1237, 1248 (7th Cir. 1991)). But the

12

St. Alexius argues that no evidence has been presented that demonstrates it had actual knowledge of its claim against Humana. According to St. Alexius, it did not discover its potential claim until 2001, when it was investigating other reimbursement issues, and it then brought suit promptly.

But Illinois law clearly holds that Humana does not have to show actual knowledge--constructive notice is sufficient for laches to apply (LaSalle, 337 Ill.App.3d at 352, 785 N.E.2d at 1002). As LaSalle, id. at 353, 785 N.E.2d at 1003, quoting Pyle v. Ferrell, 12 Ill.2d 547, 554, 147 N.E.2d 341, 345 (1958), explains, the test for constructive notice "is not what the [party] knows, but what he might have known by the use of the means of information within his reach with the vigilance the law requires of him." And as People ex rel. Hartigan v. Progressive Land Developers, Inc., 216 Ill.App.3d 73, 81, 576 N.E.2d 214, 219 (1st Dist. 1991) (citation omitted) holds:

> To establish unreasonable delay, the plaintiff must show that the defendant failed to seek prompt redress after acquiring knowledge of the fact supporting his claim. However, it is not necessary that the plaintiff have actual knowledge of the specific facts upon which his claim is based. If the circumstances are such that a reasonable person would make inquiry concerning these facts, the plaintiff will be charged with laches if he fails to ascertain the truth through readily available channels.

---

doctrine has evolved as the distinction between equity and law has faded away, so that it now applies to legal claims as well (Teamsters, 283 F.3d at 881; Bill, 2004 WL 1440664, at *6; Lee v. City of Decatur, 256 Ill.App.3d 192, 196, 627 N.E.2d 1256, 1259 (4th Dist. 1994).

In that respect, the fact that Humana stopped paying annual rate increases in 1996 and did not increase the rates in any year thereafter for such a substantial period surely provided more than ample notice of the claim for which St. Alexius now belatedly seeks to recover. St. Alexius does not assert that Humana did anything to conceal the fact it was making its payments at the same rate rather than at any increased level, and such absence of payments at any higher rate would have been readily apparent to anyone reviewing the books. If St. Alexius did not indeed spot a potential claim on that score until 2001 as it contends, it has no one to blame but itself.

St. Alexius also urges that Humana has failed to provide any evidence that it suffered any prejudice from its delay in bringing the claim. To the contrary, Humana has provided the affidavit of John Maxwell ("Maxwell"), who was responsible for negotiating hospital service agreements on behalf of Humana. Maxwell attests there that Humana would have negotiated different terms with St. Alexius had the latter asserted a right to annual rate increases beyond March 1, 1996 (Maxwell Aff. ¶14).

St. Alexius argues that Maxwell's sworn statement is just speculation as to how Humana would have reacted had St. Alexius made its position known earlier. But that argument simply does not hold water, for after all it is St. Alexius' own fault that Humana must address the matter in speculative terms, rather than

14

being able to speak in concrete terms about a real-world situation -- one that St. Alexius' inaction prevented from occurring. For that reason, any showing by Humana that it suffered prejudice must by definition be speculative, but that does not at all discredit the uncontroverted showing it has made.

Humana has come forward with entirely plausible evidence that it would have taken a different negotiating stance if St. Alexius had asserted a claimed entitlement to continued rate increases after 1996. St. Alexius has proffered nothing in response. To the contrary, as stated at the end of the preceding section, St. Alexius' parent company expressly represented in its May 15, 2000 letter to Humana that St. Alexius agreed to "[c]ontinue participation in both Medicare and Commercial plans at their existing contract rates through December 31, 2001," without even a whisper to suggest that "existing contract rates" were anything other than the rates at which Humana was making -- and St. Alexius was accepting -- payments.

It is clear, then, that St. Alexius has failed to create a genuine issue of material fact on either of the two prongs of the laches inquiry. And that being so, Humana would be entitled to summary judgment based on its laches defense even if this Court had accepted St. Alexius' unpersuasive position that the annual rate increase provisions of the Agreement somehow extended beyond March 1, 1996.

## Conclusion

Each of the two paths explored in this opinion leads to the same destination: Whether viewed in terms of the meaning of the parties' contractual relationship or from the perspective that even a legitimate basis for St. Alexius' position (which this Court has found wanting) would be overridden by St. Alexius' unreasonable delay in bringing its claim (and the consequent prejudice to Humana), Humana prevails on the claim currently at issue. To speak in the familiar Rule 56 locution, there is no genuine issue of material fact as to FAC Count II, and Humana is entitled to a judgment as a matter of law.

Accordingly Humana's summary judgment motion is granted, St. Alexius motion is denied, and FAC Count VII is dismissed.[7] Whatever claims remain viable in this action will be addressed at

---

[7] This opinion is the final end product that stems from the last assignment on which this Court's fine law clerk, Barry Blonien, worked before going on to the more rarified atmosphere of clerking for a particularly distinguished jurist, Chief Judge Douglas Ginsburg of the Court of Appeals for the District of Columbia. This Court would be remiss if it were to let the occasion pass without acknowledging the outstanding work done by Mr. Blonien throughout his year's tenure here. It is always especially rewarding to deal with a clerk who is not diffident about posing intellectual challenges in a thoughtful way -- one that forces judicial introspection to see whether the challenged views can hold up under scrutiny. And to scotch any mistaken notion that any errors that may crop up in this end product are somehow ascribable to Mr. Blonien's production of the initial draft, this Court renews the disclaimer that it invariably repeats in paying tribute to any of its clerks: Because a final text such as this one is always reworked by this Court sentence by sentence, with every cited case having been read, this Court alone bears responsibility for any ultimate glitches.

the next (and previously scheduled) status hearing date of September 9, 2004.

/s/ Milton I. Shadur
Milton I. Shadur
Senior United States District Judge

Dated: August 6, 2004