```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION
```

```
ALEXIAN BROTHERS HEALTH PROVIDERS  )
ASSOCIATION, INC., et al.,         )
                                   )
     Plaintiffs-Counterdefendants, )
                                   )
     v.                            )    No.  02 C 271
                                   )
HUMANA HEALTH PLAN, INC., et al.,  )
                                   )
     Defendants-Counterplaintiffs. )
```

<u>MEMORANDUM OPINION AND ORDER</u>

Alexian Brothers Health Providers Association, Inc. ("Association"), Alexian Brothers Medical Center ("Medical Center") and St. Alexius Medical Center (collectively "Alexian," treated after this sentence as a singular noun for convenience) sued Humana Health Plan, Inc., Humana Insurance Company, Humana HealthChicago Inc. and Humana HealthChicago Insurance Company (collectively "Humana," also treated as a singular noun for the same reason)[1] for breach of contract. Humana in turn filed a Counterclaim, which it has superseded twice--first by an Amended Counterclaim and then by a Second Amended Counterclaim ("SACc"), each count of which also claims breach of contract.

Each side has supplemented the FPTO by raising some evidentiary objections that require in limine disposition. With

---

[1] According to the uncontested facts set out in the Final Pretrial Order ("FPTO") that has been entered in anticipation of trial, Humana HealthChicago, Inc. and Humana HealthChicago Insurance Company were merged out of existence before the filing of this lawsuit--the first into Humana Health Plan, Inc. and the second into Humana Insurance Company.

full briefing having been provided, the motions can be addressed in turn.[2]

## **Applicable Standards**

District courts "have broad discretion in ruling on evidentiary questions during trial or before on motions <u>in limine</u>" (<u>Jenkins v. Chrysler Motors Corp.</u>, 316 F.3d 663, 664 (7th Cir. 2002)). Although the Federal Rules of Evidence ("Rules") do not explicitly authorize motions in limine, the practice of excluding evidence in limine "has developed pursuant to the district court's inherent authority to manage the course of trials" (<u>Luce v. United States</u>, 469 U.S. 38, 41 n. 4 (1984)).

Evidence should be excluded in limine only when it is

---

[2] For more convenient reference, this opinion uses the abbreviation "Mo." when citing to specific portions of any motion and "Mem." when citing to memoranda. Alexian has numbered its motions, and this opinion adopts that enumeration in this way: (1) Motion in Limine #1 To Bar Evidence Relating to "Amended Attachment F" and to Any Agreement To Amend the Termination Provisions of the IPA Agreement ("A. Mo.1"), (2) Motion in Limine #2 To Bar Evidence Relating to the Amount of Any Institutional Service Fund Deficit ("A. Mo.2") and (3) Motion in Limine #3 To Bar the Testimony and Expert Report of Scott Stringer ("A. Mo.3"). Although Humana did not similarly number its motions, this opinion will refer to them in numbered fashion: (1) Motion in Limine To Exclude Testimony and Expert Report of Plaintiffs' Opinion Witness, Rebecca Haworth Campbell ("H. Mo.1"), (2) Motion in Limine To Bar Plaintiffs' Argument Regarding Evidence in Support of Count VIII of Second Amended Counterclaim ("H. Mo.2") and (3) Motion in Limine To Bar Plaintiffs' Evidence in Support of Their Purported Claim for Interest Under the Illinois "Prompt Payment Act" ("H. Mo.3"). All responses will be denoted "Resp."--for example, Humana's response to A. Mo.1 will be cited "H. Resp. 1," its response to A. Mo.2 will be cited "H. Resp. 2" and so on.

clearly inadmissible on all potential grounds (<u>Jimenez v. United States</u>, No. 06 C 5943, 2008 WL 3849915, at *1 (N.D. Ill. Aug. 14)). If that "high standard" is not met, "evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." (<u>Hawthorne Partners v. AT & T Techs., Inc.</u>, 831 F.Supp. 1398, 1400 (N.D. Ill. 1993)). It is thus the movant's burden to establish that the evidence sought to be excluded is not admissible for any purpose (<u>id</u>.).

### Amended Attachment F

Alexian seeks an order barring Humana from introducing any evidence relating to (1) "Amended Attachment F," (2) "any negotiations between the parties to amend the termination provisions of the IPA Agreement" and (3) "any amendment of the termination provisions of the IPA Agreement." Alexian and Humana agree that in October 2000 the parties executed a "formal amendment" ("Formal Amendment") to the IPA Agreement that had originally been executed in 1994. They also agree that Association sent Humana a November 1, 2000 letter describing Association's intent to terminate the IPA Agreement eight months later on June 30, 2001 ("Termination Letter").

Humana asserts that such a termination was without cause and was therefore contrary to the terms of Amended Attachment F, an amendment to the IPA Agreement that was allegedly included in the

Formal Amendment and that would have precluded termination without cause. But the parties disagree as to whether "Amended Attachment F" was actually included as part of the Formal Amendment or whether any other amendment was executed that would likewise have changed the termination provisions of the IPA Agreement.

Alexian argues that the evidence at issue here must be barred under Rule 901(a), which "as a condition precedent to admissibility" calls for "evidence sufficient to support a finding that the matter in question is what its proponent claims." Alexian asserts that no Humana representative who negotiated or signed the Formal Amendment recalls negotiating or having seen Amended Attachment F or any other amendment to the termination provisions of the IPA Agreement. Indeed, Alexian states that an Association representative who negotiated and signed the Formal Amendment will testify (1) that the parties did not negotiate over Amended Attachment F or any such similar instrument and (2) that he would not have signed the Formal Amendment had it contained any amendment to the termination provisions. According to Alexian, no Humana representative can provide competent testimony necessary to prove "that the matter in question is what [Humana] claims" it to be, so that any evidence of negotiation or agreement regarding amendment of the termination provisions, including Amended Attachment F, should be

inadmissible under Rule 901(a).

That stance would put a greater burden on Humana than the Rule requires. <u>Thanongsinh v. Bd. of Educ.</u>, 462 F.3d 762, 779 (7th Cir. 2006) has reconfirmed that "Rule 901 does not erect a particularly high hurdle" to overcome. Humana "need only make a <u>prima facie</u> showing that the exhibit is what the proponent claims it is" (<u>Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec</u>, 476 F. Supp. 2d 913, 921 (N.D. Ill. 2007), <u>affirmed in part and vacated and remanded in part, all on other grounds</u>, 529 F.3d 371 (7th Cir. 2008)). All that is required is that "sufficient evidence be adduced to allow the document to go to the trier of fact. All other factors will go [to] the weight or credibility" (<u>LDI Corp. v. Investor Group Leasing Ltd.</u>, No. 95 C 5244, 1997 WL 733891, at *6 (N.D. Ill. Nov. 17)). Requiring such resolution at trial echoes the already-cited holdings in <u>Jimenez</u> and <u>Hawthorne Partners</u>.

Humana has made the requisite prima facie showing. It represents that through testimony and evidence of its customary practices and of the actual drafting of Amended Attachment F it intends to show that the signed Formal Amendment, including Amended Attachment F, properly made it into its contract file, supporting its contention that the parties incorporated Amended Attachment F into the Formal Amendment. It buttresses that

submission with electronic-based evidence of authenticity.[3]

Whether Amended Attachment F was indeed so incorporated is a question for another day, to be determined by this Court acting as trier of fact.[4]  But in terms of threshold admissibility, it suffices to note Alexian's failure to show that it is "clearly inadmissible on all potential grounds."  And that is true as well as to other evidence Alexian seeks to bar under Rule 901-- including negotiations regarding, or amendments to, the termination provisions of the IPA Agreement.[5]

## Institutional Service Fund Deficit

Through SACc Count I, Humana seeks damages that it claims Association owes for its share of an Institutional Service Fund deficit that accrued from October 1, 1998 to May 31, 2000.  But Alexian wishes to bar Humana from introducing "any evidence relating to the amount of any alleged Institutional Service Fund deficit."  A. Mo.2 at 8-9 lists particular exhibits that Alexian

---

[3]  Essentially Alexian contends that Amended Attachment F was fraudulently added by Humana when the parties' dispute arose. Needless to say, that assertion ought to be supported by something other than Alexian's ipse dixit.

[4]  As the FPTO specifies, this case will involve a bench, rather than jury, trial.

[5]  It is worth observing here that denial of a motion in limine "does not mean that all evidence contemplated by the motion will be admitted at trial" (Jimenez, 2008 WL 3849915, at *1).  Luce, 469 U.S. at 41-42 has explained that a "district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling."  It is simply premature to order the evidence excluded at this point.

would bar, including computer-generated spreadsheets, computer disks and letters that relate to the amount of the alleged deficit.

Alexian challenges the introduction of such evidence under Rule 901(b)(9), which permits authentication of a "process or system" by "evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result." Alexian also points to the requirements at Rule 803(6), the business records exception to the hearsay rule. According to Alexian, none of Humana's witnesses purports to have sufficient knowledge of the actual amount owed under the alleged deficit, so that Humana is not entitled to introduce any evidence on that score. Not so--Alexian's attempted reliance on Rule 901(b)(9) misses the mark, for under the circumstances presented here Humana has provided sufficient authentication of the disputed evidence.

Alexian attempts to load Rule 901 with more baggage than it was intended to carry. Rule 901(a) explains the general requirement that authentication or identification of evidence is a precondition to its admissibility, "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(b) then provides an instructive list of "examples of authentication or identification conforming with the requirements" of Rule 901(a)--examples that

it says are provided "[b]y way of illustration only, and not by way of limitation." By definition, then, those examples do not exhaust the potential ways by which evidence can be shown to meet Rule 901(a)'s requirement. Thus Rule 901(b)(9), though it may be illustrative, provides no real constraint on the authentication of evidence.

In short, Alexian is simply wrong when it says "Humana is unable to satisfy the underlinerequirements/underline of Rule 901(b)(9)" (A. Mo.2 at 2 (emphasis added)). No such "requirements" exist. Again all Rule 901(a) demands is "sufficient evidence" to find that the evidence in question "is what its proponent claims."

That does not of course obviate the need for Humana to establish that its evidence related to the calculation of a deficit amount is reliable. For that purpose this opinion turns to the business records exception to the hearsay rule embodied in Rule 803(6).

In that respect such cases as Collins v. Kibort, 143 F.3d 331, 337 (7th Cir. 1998)(internal quotation marks and brackets omitted) teach:

> A proper foundation is established if the party attempting to admit the evidence demonstrates that the business records are kept in the course of regularly conducted business activity, and that it was the regular practice of that business activity to make records, as shown by the testimony of the custodian or otherwise qualified witness.

Rule 803(6) thus does not require that the witness establishing the foundation for such documents "be the person who prepared the

record," nor does it require "that the witness have personal knowledge of the entries in the records" (id. at 337-38).  Rather Rule 803(6) requires only "that the witness have knowledge of <u>the procedure</u> under which the records were created" (id. at 338 (emphasis added)).

As further clarified by the Advisory Committee Note on the 1974 enactment of Rule 803(6):

> It is the understanding of the committee that the use of the phrase "person with knowledge" is not intended to imply that the party seeking to introduce the memorandum, report, record, or data compilation must be able to produce, or even identify, the specific individual upon whose first-hand knowledge the memorandum, report, record or data compilation was based.  A sufficient foundation for the introduction of such evidence will be laid if the party seeking to introduce the evidence is able to show that it was the regular practice of the activity to base such memorandums, reports, records, or data complications upon a transmission from a person with knowledge.

That Note goes on to explain that a sufficient foundation for introduction of a computer printout can be shown "upon a report from the company's computer programmer <u>or one who has knowledge of the particular record system</u>" (id. (emphasis added)).  Thus the qualified witness need not be a computer programmer to lay the foundation for the business records hearsay exception (see, e.g., United States v. Whitaker, 127 F.3d 595, 601 (7th Cir. 1997)).  And as the Note states, it is enough for Humana to produce a qualified witness with "knowledge of the particular

record system"--in this instance Daniel Taetszch ("Taetszch").[6]

Alexian challenges Taetszch's ability to provide a foundation for the contested records by focusing attention on how much he assertedly does not know about those records.[7]  But Humana has demonstrated, through Taetszch's deposition testimony and declaration, that he had sufficient "knowledge of the procedure under which the records were created" (Collins, 143 F.3d at 338).  Taetszch has served as Director of Finance for the Humana Chicago market since 2001 and had been employed in other managerial roles in Humana's finance department since at least 1995 (Taetszch Decl. ¶¶1, 2).  In his deposition testimony and his declaration Taetszch describes in sufficient detail the unsurprising process by which Humana's Finance Department, as

---

[6]  It is also inconsequential whether the computer-generated reports at issue were themselves kept in the ordinary course of business (United States v. Fujii, 301 F.3d 535, 539 (7th Cir. 2002)).  Instead it has long been established that the test for admissibility of computer-generated records focuses on whether the "data compiled and presented in computer printouts" meet the requirements of Rule 803(6)--even when those printouts have been "prepared specifically for trial" (id. (emphasis added); see also United States v. Briscoe, 896 F.2d 1476, 1494-95 (7th Cir. 1990)).

[7]  For example, Alexian notes that Taetszch "had no role in developing or designing the Service Fund System" (A. Mo.2 at 5).  While it is quite probably true that the developers and designers could provide an adequate foundation, those individuals are not necessarily the only "qualified witnesses" under Rule 803(6).  It is likewise unimportant that Taetszch "did not know who loaded the claims data into the Service Fund System" (A. Mo.2 at 6), because a witness need not have "personal knowledge of the entries in the records" to establish a foundation (Collins, 143 F.3d at 338).

part of its regularly conducted business activity, kept claims data and used that data to generate reports regarding risk sharing (H. Resp. 2 7-9, 11).[8]

Alexian has done nothing to put in doubt the accuracy of that system. All of the evidentiary challenges that it posits through its motion hinge on the purported inaccuracy of that system. But Alexian has failed to establish that "the source of information or the method or circumstances of preparation indicate lack of trustworthiness" (Rule 803(6); see also <u>Fujii</u>, 301 F.3d at 539). And because Alexian has not met its "high standard" of showing that the challenged evidence is "clearly inadmissible on all potential grounds," any further evidentiary rulings as to that evidence will be deferred until trial (<u>Jimenez v. United States</u>, 2008 WL 3849915, at *1). A. Mo.2 is therefore denied.

## Testimony of Scott Stringer ("Stringer")

Alexian also seeks to bar Humana from introducing the Fed. R. Civ. P. 26 expert reports and the testimony of Stringer, whom Humana designated as an opinion witness. Medical Center and Humana are parties to a Hospital Participation Agreement under which Medical Center provides inpatient and outpatient hospital

---

[8] It seems entirely unremarkable that Humana would cultivate such data and turn it into useful reports. Just how would Alexian expect Humana to effectuate risk-sharing agreements without resorting to such a system?

services to Humana members in exchange for discounted rates.
Humana's SACc Count VIII charges that Medical Center increased
its rates without notifying Humana and without increasing its
discounts to Humana, thus breaching the Hospital Participation
Agreement.  Humana says that the alleged breach caused it to
overpay Medical Center to the tune of $3,934,719.  To support
that assertion Humana seeks to introduce the opinion testimony
and report of Stringer, who concluded that "damages under Count
VIII of the Second Amended Counterclaim is approximately
$3,935,000."

Alexian challenges the methodology Stringer used to arrive
at that figure and argues that his testimony and report should be
barred under Rule 702:

> If scientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence or
> to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion or
> otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 (1993)
set out a two-part test for determining the admissibility of
testimony under Rule 702: "whether the expert is proposing to
testify to (1) scientific knowledge that (2) will assist the
trier of fact to understand or determine a fact in issue."  Then
Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) made clear

that "Daubert's general holding--setting forth the trial judge's general 'gatekeeping' obligation--applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." When gauging reliability, "the district judge must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable" (Zelinski v. Columbia 300, Inc., 335 F.3d 633, 640 (7th Cir. 2003)).

Rule 702's 2000 version of the Advisory Committee Notes[9] explains that "the rejection of expert testimony is the exception rather than the rule" and that "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." In applying Rule 702 "the court's focus is on the expert's methodology" (Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co., 128 F. Supp. 2d 1148, 1150 (N.D. Ill. 2001)). But the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier

_____

[9] In the interest of full disclosure, this Court must plead guilty to having acted as chairman of the Advisory Committee's subcommittee assigned to the revision of Rules 701 to 703 for the Committee's consideration and, in that capacity, as having had the primary responsibility for drafting the Advisory Committee Notes together with Professor Dan Capra, the talented Reporter for the Committee. That role led in turn to this Court's singular honor of being appointed by Chief Justice Rehnquist to the Committee's chairmanship in 1999.

of fact" (<u>Smith v. Ford Motor Co.</u>, 215 F.3d 713, 718 (7th Cir. 2000)), so that in deciding a motion in limine "[i]t is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound" (<u>id</u>. at 719). For our Court of Appeals' most recent exposition and application of that gatekeeping role, see <u>Lewis v. CITGO Petroleum Corp.</u>, No. 08-1483, 2009 WL 902288, at *5-*6 (7th Cir. Apr. 6). By contrast, attacking the validity of an opinion that has survived the gatekeeping analysis is the role not of the court, but of the litigant in cross-examination (<u>Spearman Indus.</u>, 128 F. Supp. 2d at 1150).

Alexian presents a number of contentions as to why Stringer's methodology is flawed and his testimony and report should be excluded at trial. While this Court does not agree with every argument that Alexian presents,[10] certain aspects of Stringer's methodology do make his opinion as to damages unreliable.

Perhaps most problematic is Stringer's decision to exclude from his sample set all billing codes for which the Medical Center's charge was $0 in any time period that he compared.

---

[10] For example, Stringer's use of sampling and his elimination of perceived outliers seem unremarkable.

14

Stringer's report attributed that decision to "mathematical purposes."  In his deposition he elaborated that such "mathematical purposes" stemmed from a basic arithmetical truth: It is impossible to divide by zero.  Despite that truth, a close look at Stringer's methodology reveals that it was unnecessary for him to discard from his analysis all billing codes where he essentially created a non-problem of dividing by zero, because the stage where he did so was not at all critical--but was instead unnecessary--to his calculation of the aggregate rate changes.

While this Court (whose misspent youth as a college undergraduate involved majoring in mathematics and physics) of course recognizes the problems inherent in any formulation that requires division by zero, it cannot accept Stringer's solution as one that would produce a reliable accounting of damages. Damages for Count VIII purposes are entirely dependent on changes in the rates charged by Medical Center.  In calculating such damages Stringer relied on a formula he developed that was intended to be based on average rate increases over time.  In doing so Stringer selected a subset of billing codes that he considered appropriate for analysis, comparing each of those billing codes over different periods of time.  For each comparison he calculated the change in dollars over time and also the percentage change in the average charge rate.

Stringer's deposition testimony identified the code-by-code calculation of the percentage changes as the source of his division-by-zero problem. That is, he was able to calculate the change over time in terms of dollars without any problem, but when he sought to compute the _percentage_ change in any billing code where a zero dollar amount was involved, his calculation produced an error due to the inherent division problem. Stringer consequently decided to discard those billing codes summarily from his sample set, despite the fact that those codes presented no problem at all in calculating the change over time in terms of dollars.

Stringer further testified at his deposition that he calculated those individual percentages so that he could "visually see" them, even though his "computations were taken in the aggregate as a whole." But because his evaluation properly depended on aggregate computations and not individual percentages, there was no good "mathematical reason" to toss any billing codes just because he couldn't "visually see" the individual percentage changes. It would appear that Stringer could have simply added up the dollar changes and calculated a percentage change over time from the aggregate total. Doing so would have saved the data that Stringer discarded.

Despite that flaw in Stringer's explanation of the "mathematical reason" for his elimination of codes with zero-

dollar values, Humana proffers a somewhat different argument in an effort to support Stringer's methodology.  Humana submits that when Medical Center reduced a charge under one code to zero, the service or supply associated with that code did not really become free of charge--it was simply moved to another billing code. Presumably such shifts in code designations would have no effect on Stringer's calculations.

To support that assertion Humana cites the deposition testimony of the Medical Center's former chief financial officer Terry L. Heck ("Heck").  But in the same portion of the deposition that Humana cites, Heck says that it was improper to ignore codes where the charges had been reduced to zero because the rate restructuring was more complicated than Humana lets on (Heck Dep. 82-85).  Heck explains that some services or supplies might very well have become free of charge, while at the same time other charges for different services or supplies were enhanced (id.).  Hence Heck says that the proper focus is on the aggregate change in gross charges (id. at 85-86).

By neglecting to take account of codes where the associated charges were reduced to zero, Stringer created the potential for skewing the results to exaggerate the aggregate effect of charges that were enhanced over time.  Whether for "mathematical purposes" or because of an erroneous understanding of Medical Center's code restructuring, Stringer's decision to eliminate all

17

billing codes with zero-dollar values was misguided and made his calculations methodologically unsound.

It is not this Court's responsibility to crunch the numbers for the parties. It cannot know at this point what effect if any Stringer's elimination of the zero dollar codes had on his ultimate calculation of damages. But common sense as well as the Daubert-Kumho canon teach that the critical issue is the soundness of Stringer's methodology, for only such soundness provides a reasonable assurance that the GIGO ("garbage in, garbage out") hazard has been avoided.

In short, this Court's exercise of its gatekeeper function compels the conclusion that Stringer's methodology was flawed, so that his calculation of damages is unreliable. Humana's motion is therefore granted, and Stringer's testimony and report will not be received into evidence at trial.

### Testimony and Report of Rebecca Haworth Campbell

In Humana's motion in limine as to Alexian's disclosed opinion witness Rebecca Haworth Campbell ("Haworth"), it stated that it expected her to testify at trial to rebut Stringer's damage calculations for SACc Count VIII (H. Mo.1 at 1). In light of the just-announced ruling barring Stringer's testimony and report, Humana's motion in limine regarding Haworth has become largely moot. Nonetheless, because the possibility remains that Alexian may still seek to call Haworth to testify, this opinion

will not treat that as a stopping point for its analysis.

There is of course no need to repeat what has already been said as to this Court's gatekeeper function--that applies here with equal force. It is nonetheless useful to note the principle that "[a]nyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness" (<u>Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.</u>, 223 F.3d 585, 591 (7th Cir. 2000)).

Humana charges that Haworth is "not qualified in the field of economic damages analysis" and that many of the opinions offered in her report and in her deposition testimony are irrelevant or otherwise flawed (H. Mo.1 at 2). To that end Humana challenges (1) Haworth's education and employment experience, saying she lacks the necessary qualifications to present Rule 702 testimony about Humana's claimed damages in Count VIII, (2) her criticisms of Stringer's method, saying they are based on meaningless projections of Medical Center's gross annual charges and (3) her principles and methods, calling them unreliable because she misunderstood the scope of the data available to Humana and Stringer for purposes of calculating Humana's damages (H. Mo.1 at 3). For those reasons Humana seeks to exclude her report and testimony at trial.

Apart from the consideration of mootness, which is put aside for the moment, as a substantive matter Haworth cannot be

permitted to rebut the methodology that shaped Stringer's damages calculation. Haworth simply lacks the "relevant" expertise and experience to testify under Rule 702 as to the soundness of the methodology underlying Stringer's calculations (Tuf Racing Prods., 223 F.3d at 591).

Indeed, Alexian all but admits as much in its response to Humana's motion. It makes no real attempt to show any disagreement with Humana's accusation that Haworth is not a qualified "economic damages analyst" (A. Resp. 1 at 6). Instead Alexian contends that Haworth's central criticism of Stringer concerns the issue of liability, not the methodology behind his calculation of damages (id.). That is, Haworth's fundamental dispute with Stringer was as to his conclusion that Medical Center breached the Hospital Participation Agreement.

On that score Alexian asserts that no such breach occurred because the issue central to SACc Count VIII is "not whether Humana paid a higher rate for certain services rendered by [Medical Center] than it may have previously paid"--the focus of Stringer's analysis--but rather "whether there was an overall increase in [Medical Center]'s Charge Master."[11] In that respect

---

[11] Medical Center's "Charge Master" is essentially a computer-based price list in which each available service or supply is assigned a numeric code and a dollar value. It formed the basis for Medical Center's billings to Humana for reimbursement. Stringer did not base his analysis on the Charge Master because Humana claimed it was impossible to reconstruct its historical data. Instead he was compelled to employ his own

Alexian argues that to prove liability Humana must establish that Medical Center increased the rates charged under its Charge Master taken as a whole.

For that purpose Haworth's claimed "expertise" is not said to be in the area of damages calculation, but rather in "Charge Master analysis," which Alexian contends is the central issue for determining liability (id.).  Humana admits that Haworth has expertise in "Charge Master Standardization" (H. Mo. 1 at 10).  Even on that premise, however, this Court must still evaluate Haworth's methodology to rule on the admissibility of her opinion testimony and report.  That evaluation reveals deficiencies in her methodology that preclude such admission under Rule 702.

Most egregious among those deficiencies is Haworth's reliance on <u>projected</u> reductions in the Charge Master's overall charge rate, rather than on actual data, to argue that Alexian has no liability under Count VIII.  Haworth once served as a consultant to Medical Center, working on a project to standardize its Charge Master.  Haworth's "expert report" asserts that Medical Center reduced its overall usual and customary charges by $33 million between 1999 and 2002.  But that statement is predicated on Haworth's finding that the Charge Master in 1999

---

methodology based on other data.  Alexian contends that looking to the Charge Master is the preferred means by which to assess any damages, and it is through Haworth's expertise, at least in part, that it seeks to bring that analysis to light.

showed annual charges of $606.5 million, but by 2002 the gross charge _projections_ were reduced to $573.5 million.

Humana charges that Haworth's reliance on projections is improper--that if Alexian is right in its insistence that the focus should be on actual data and not on Stringer's calculations, it makes no sense for Haworth to rely on the projected 2002 figure rather than on actual data. Yet despite the centrality of the purported $33 million reduction in charges to the conclusions reached in Haworth's testimony and report, Alexian's response does not even address that fundamental problem with Haworth's analysis.

It is unnecessary to speculate on the reason for that critical omission. Alexian would obviously be hard pressed to advance any argument that Haworth's reliance on projections is methodologically sound on the one hand, while on the other hand it criticizes Stringer's methodology for _his_ failure to rely on actual data. Hence Humana's motion to exclude the Haworth testimony and report is granted.

### Evidence in Support of Count VIII

Humana seeks to bar Alexian from arguing at trial that Humana's damages calculation for Count VIII is invalid to the extent that Humana did not analyze Medical Center's actual Charge Master. Humana explains that it never possessed nor had access to the Charge Master at any time relevant to this litigation--

that it never received the Charge Master during the damages period and that Alexian was unable to fulfill a discovery request for a copy of the Charge Master because, Alexian claimed, it was unable to reconstruct the Charge Master using historical data.

Any ultimate ruling as to what role may be ascribed to the Charge Master in assessing damages is for the future. But for now Humana has not made a convincing argument why Alexian should be precluded from even asserting the Charge Master's relevance to the damages determination.

In that regard Alexian acknowledges that the Charge Master changes over time and that it does not maintain historic snapshots of the Charge Master that could have been transmitted to Humana during discovery. But against that Alexian points out that Humana had a contractual right to access and audit Medical Center's Charge Master throughout the time period covered by this litigation and that Humana had in fact monitored charges in the past. And it is true that Alexian attempted to work with Humana to reconstruct at least a close approximation of the relevant data, though whether that post hoc attempted substitution for the real thing satisfies Alexian's responsibility to Humana is very much in dispute.

Just where that congeries of facts places the litigants remains to be seen when they are tested in the crucible of trial. For the present it suffices to say that Humana's motion to

foreclose any argument by Alexian along the indicated lines is denied.[12]

### Prompt Payment Act ("Act," 215 ILCS 5/368a)[13]

Humana seeks to bar Alexian from making any argument or introducing any evidence at trial for recovery of prejudgment interest under the Act. Alexian's First Amended Complaint ("FAC") described the relief it sought under each count, and each count included a catchall prayer for "other further relief deemed reasonable and appropriate." It was not until submission of the FPTO that Alexian announced its intention to pursue prejudgment interest under the Act. In addition to challenging that effort as outside the scope of the FAC, Humana urges both (1) that no

---

[12] This opinion has perforce been limited to a few issues that the parties have distilled out of their lengthy discovery process after having themselves resolved many of their disputes that triggered their competing claims. Thus the results reached here do not necessarily control the outcome of the upcoming trial. To choose one obvious example, if it were to be determined that Humana's inability to prove its damages stems from Alexian's failure to give Humana the required notice as to rate increases, as well as its not providing Humana with full access to the records (including Alexian's Charge Master for the period in dispute) that are required to calculate the parties' respective rights and obligations, the principle announced long ago in Bigelow v. RKO Pictures, Inc., 327 U.S. 251, 264-65 (1946) and repeated and applied many times since then would have to be taken into account. Despite its age, Bigelow remains the seminal authority in this area--but its principle has been reconfirmed and applied over the years in a number of cases applying Illinois law, including several from our Court of Appeals (see 20 C West's Ill. Dig. Damages Key No. 6 (2006)).

[13] Citation to the Act will take the form "Section 368a," omitting the prefatory "215 ILCS 5/."

private right of action exists to enforce the Act and (2) that the Act would not apply to Alexian's claims in any event.

As for the issue of scope, the FAC's demands for relief--though stated in the most general of terms--suffice to meet the notice pleading standards of Rule 8(a)(3). <u>Bontkowski v. Smith</u>, 305 F.3d 757, 762 (7th Cir. 2002) has explained that while that Rule requires a complaint to "contain 'a demand for judgment for the relief the pleader seeks,' the demand is not itself a part of the plaintiff's claim." Hence a complaint's failure to specify all the relief to which a plaintiff is assertedly entitled does not warrant dismissal for failure to state a claim (<u>id</u>.). Indeed, under Rule 54(c) "a prevailing party may obtain any relief to which he's entitled even if he has not demanded such relief in [his] pleadings" (<u>id</u>. (internal quotation marks omitted)).

That however only sets Alexian on the path that might perhaps lead it to the relief it seeks. And that path comes to a dead end because the Act, fairly read, provides Alexian no private right of action.

Because no Illinois court has yet addressed that question, <u>Erie v. Tompkins</u> principles obligate this Court to predict what the Illinois Supreme Court would do if presented with the issue (<u>Allstate Ins. Co. v. Menards, Inc.</u>, 285 F.3d 630, 633-37 (7th Cir. 2002)). In that respect <u>Metzger v DaRosa</u>, 209 Ill.2d 30,

36, 805 N.E.2d 1165, 1168 (2004) has repeated the Illinois

Supreme Court's identification of four factors to guide the

determination of whether a private right of action may be implied

from a statute:

> Implication of a private right of action is appropriate if:
> (1) the plaintiff is a member of the class for whose benefit
> the statute was enacted; (2) the plaintiff's injury is one
> the statute was designed to prevent; (3) a private right of
> action is consistent with the underlying purpose of the
> statute; and (4) implying a private right of action is
> necessary to provide an adequate remedy for violations of
> the statute.

Here that fourth factor--necessity or its absence--plainly

defeats Alexian's pursuit of prejudgment interest under the Act

and compels granting Humana's motion in limine.[14]

Illinois courts find such necessity exists "only in cases

where the statute would be ineffective, as a practical matter,

unless such an action were implied" (Fisher v. Lexington Health

Care, Inc., 188 Ill.2d 455, 464, 722 N.E.2d 1115, 1120 (1999)).

Where the Illinois General Assembly has created another

enforcement mechanism, courts are reluctant to find private

enforcement necessary (see, e.g., Vill. of McCook v. Ill. Bell

Tel. Co., 335 Ill.App.3d 32, 38, 780 N.E.2d 335, 339-41 (1st

_____

[14] This is not to say that Alexian could surmount the other
three hurdles, a doubtful premise in light of the Illinois
Supreme Court's approach to those parts of the test in recent
cases (see, e.g., Metzger, 209 Ill.2d at 37-39, 805 N.E.2d at
1169-70). But because Alexian is dead in the water in terms of
the fourth factor and (to mix metaphors) because even one strike
suffices to call legal batter Alexian "out," this opinion will
not enlarge the discussion unduly.

Dist. 2002); Abbott Labs. v. Granite State Ins. Co., 573 F.Supp.
193, 196 (N.D. Ill. 1983)).  Even a lack of proper enforcement by
the responsible state agency generally does not give rise to an
implied right of action (see, e.g., Langendorf v. Travelers State
Ins. Co., 625 F.Supp. 1103, 1106 (N.D. Ill. 1985)).

In passing the Act, the Illinois legislature charged the
Department of Insurance ("Department") with enforcement (Section
368a(d)) and gave the Department a variety of tools to "penalize"
and "enforce compliance" with the Act (Section 368a(e)).  Those
powers, including the ability to issue cease and desist orders,
impose fines and adopt rules for enforcement, make it unnecessary
for private citizens to enforce the Act through lawsuits.  If the
General Assembly had wished to supply private parties with an
additional remedy, it could readily have done so in express
terms.[15]  Its silence counsels the strongest of negative
inferences (really an understatement).

Nor can Alexian retreat to the position that it is not
seeking an implied right of action.  After all, it is trying to
enforce the Act by obtaining remedies that the Act alone
provides.  As Vill. of McCook, 335 Ill.App.3d at 39, 780 N.E.2d
at 341 puts it as to a like effort, "'Artful pleading' will not

_____

[15]  Several states wishing to increase the enforcement of
similar statutes have done just that (see, e.g., Va. Code Ann.
§38.2-3407.15(E)(West 2008); W. Va. Code Ann. §33-45-3 (West
2008)).

27

disguise plaintiff's endeavors to enforce the Act."

In sum, Humana's motion is granted. No view is of course expressed here as to whether an award of prejudgment interest under the Illinois statute that generally governs that issue (815 ILCS 205/2) would be appropriate should Alexian prevail.

## Conclusion

As set out in this memorandum opinion and order, the parties' motions are granted in part and denied in part for the reasons and to the extent described here. And in the respects indicated earlier, some of the matters addressed by this opinion may be revisited on proper showings before or during the trial.

_____
Milton I. Shadur
Senior United States District Judge

Date: April 21, 2009